UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SUMMER SHAW,

    Plaintiff,

    v().

THE UNITED STATES DEPARTMENT
OF JUSTICE,

    Defendant.

Civil Action No. 18-593 (JEB)

**MEMORANDUM OPINION**

Timothy Blixseth went bankrupt but believes his financial troubles are due to the malfeasance of others. In pursuit of this theory, his attorney, Plaintiff Summer Shaw, wields the Freedom of Information Act in an attempt to obtain evidence of "years of potential corruption by numerous individuals" relating to bankruptcy proceedings involving Yellowstone Mountain Club (YMC), Blixseth's private ski and recreational property in Montana. See ECF No. 32-1 (Declaration of Timothy Blixseth), ¶ 3. To this end, Shaw sent a FOIA request to Defendant, the Department of Justice, seeking all emails between former Assistant Attorney General Lanny Breuer and employees at Covington & Burling, LLP, alleging that such records would reveal collusion between DOJ and adverse parties in the bankruptcy action. Dissatisfied with DOJ's response, Plaintiff brought this suit to compel the disclosure of hundreds of emails, asserting that they were improperly withheld as non-agency records or without a valid FOIA exemption. Assessing dueling Cross-Motions for Summary Judgment, the Court ultimately concludes that the Government has correctly discharged its obligations here.

I.      **Background**

Because Blixseth and YMC's history is relevant to the public interest involved, the Court will offer a simplified summary here.  Blixseth and his then-wife, Edra, developed YMC with Blixseth operating as sole owner through his business entity BGI Group, Inc., which subsequently became BLX Group, Inc.  See Kirschner v. Blixseth, No. 11-08283, 2012 WL 12885076, at *2 (C.D. Cal. Nov. 1, 2012); In re BLX Group, Inc., 419 B.R. 457, 460–61 (Bankr. D. Mont. 2009).  On September 30, 2005, Blixseth borrowed $375 million from Credit Suisse to secure funding for developing the property.  See In re BLX Group, Inc., 419 B.R. at 461.  That same day, $209 million of the $375 million wired to BLX was disbursed by Blixseth into various personal accounts to pay off personal debts.  Id.

In 2008, as part of a marital settlement agreement, Edra took ownership of the YMC entities.  Id.  According to Blixseth, "She then partnered with . . . Sam Byrne, Ron Burkle,[ who has ties to Breuer,] and Mike Meldman . . . in placing [YMC] into bankruptcy" just months after taking ownership.  See Blixseth Decl., ¶ 4.  During the bankruptcy proceedings, the circumstances surrounding the $375 million loan came to light.  Id., ¶ 5.  What followed is summarized best by the United States Court of Appeals for the Ninth Circuit in a separate but related case:

> Blixseth objected to the proposed bankruptcy settlement plan (the Plan), arguing that his ex-wife and others were the cause of Yellowstone's financial problems.  The bankruptcy court disagreed, [finding] that Blixseth had misappropriated Yellowstone's cash and property for his personal use and that his fraudulent intent in doing so could not be more clear.  The bankruptcy court entered a $40 million judgment against Blixseth — the amount the court determined was necessary to pay off certain classes of creditors.

Blixseth v. Yellowstone Mountain Club, LLC, 742 F.3d 1215, 1218 (9th Cir. 2014) (internal citations and quotation marks omitted).  Credit Suisse, Burkle, and Byrne then bought the

2

property and became the new owners. See Blixseth Decl., ¶ 21. The bankruptcy judgment was ultimately appealed to the United States District Court for the District of Montana and then to the Ninth Circuit, which affirmed it in 2016. See In re Yellowstone Mountain Club, LLC, 656 F. App'x 307, 312 (9th Cir. 2016); In re Yellowstone Mountain Club, LLC, No. 12-83, 2014 WL 1369363, at *2–3 (D. Mont. Apr. 7, 2014).

Blixseth contends that during these bankruptcy proceedings, a separate criminal investigation into his ex-wife was abruptly and improperly terminated. See Blixseth Decl., ¶ 8. He also avers that Government officials attempted to "intimidate [him] by enlisting numerous federal agencies[, such as Immigration and Customs Enforcement Agents, the United States Coast Guard in California, the Internal Revenue Service, and DOJ,] to harass and cause damage to [him and]. . . to try and send a message to [him] that [he] was not only up against dozens of lawyers in the bankruptcy process, but also up against the full force of the U.S. Government." Id., ¶¶ 9–10.

Meanwhile, as the bankruptcy judgment was on appeal to the Ninth Circuit, the Yellowstone Club Liquidating Trust (YCLT) also filed suit against Blixseth in California seeking to recover approximately $220 million on two promissory notes he had executed for YMC. Id., ¶ 13; see also Kirschner v. Blixseth, 2014 WL 12573851, at *1 (C.D. Cal. June 18, 2014) (granting YCLT's motion for summary judgment). Of particular note here, Blixseth claims that his ex-wife's former business partner told him in advance that summary judgment in favor of YCLT would be granted because of an alleged back-room meeting between Edra's camp and former top DOJ officials, who were then working for YCLT's law firm, Covington & Burling, and were connected to the judge presiding over the case. See Blixseth Decl., ¶¶ 14–16. Alleged attendees included Steven Fagell, former DOJ Criminal Division Deputy Chief of Staff and

3

Counselor and key advisor to Breuer; Edra and her attorney; and Ron Burkle and his attorney. Id., ¶¶ 15–16. It is not clear what influence these former officials from DOJ's criminal division were purportedly wielding in this civil case. At the time of the meeting, for example, Breuer had already resigned from DOJ to rejoin Covington. Id., ¶ 15. Blixseth, moreover, admits that he cannot confirm that this meeting actually occurred. Id., ¶ 17. On June 18, 2014, summary judgment was indeed granted against Blixseth by the United States District Court for the Central District of California. Id.; see Kirschner, 2014 WL 12573851, at *10.

Blixseth claims that this meeting and the alleged intimidation efforts of ICE, IRS, the U.S. Coast Guard, and DOJ were the result of YMC's "new owners enlist[ing] friends in the highest levels of the Government to intimidate [him] as well as to cause [him] financial harm" so that he would cease challenging the bankruptcy action. See Blixseth Decl., ¶ 22. He thus believes that DOJ possesses records that provide evidence of this "potential corruption and misconduct." ECF No. 32 (Plaintiff Opp. & Reply) at 3. So, on December 22, 2016, his lawyer Shaw submitted a FOIA request to DOJ's Criminal Division. Specifically, she sought emails between Breuer and individuals with email addresses ending in "cov.com," the domain name for Covington, between January 1, 2009, and December 31, 2013. See ECF No. 25 (Pl. MSJ) at 1–2. After reviewing approximately 2,760 pages of records, Defendant produced 228 pages in full and 435 in part, withheld 61 pages under certain FOIA exemptions, determined that 1,714 pages were duplicates, and classified 307 pages as non-agency records. Id. at 2. (While the stated number of pages produced, withheld under certain FOIA exemptions, determined as duplicates, and classified as non-agency records is inconsistent between the Motions, the parties only actively dispute the number of pages classified as non-agency records. See ECF No. 36 (Defendant Reply) at 1 n.1.)

Plaintiff now moves for partial summary judgement seeking the production of all pages "improperly" withheld as non-agency records. See Pl. MSJ at 4. Further, she seeks the full production of the agency records DOJ withheld and redacted pursuant to Exemption 6 (46 pages in their entirety and 439 redacted pages). See Pl. Reply at 10. Although she also initially attacked Defendant's use of Exemptions 5 and 7(C), see Pl. MSJ at 2, she now contests only the invocation of Exemption 6. See Pl. Opp. at 10. In the alternative, she requests *in camera* review of the pages if the Court denies either of her first two requests. Id. at 14–15. Defendant, in turn, cross-moves for partial summary judgment, contending that all pages were properly withheld either as non-agency records or under Exemption 6 and that *in camera* review is unnecessary. See Def. Reply at 1–2.

## II.    Legal Standard

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that would change the outcome of the litigation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). In the event of conflicting evidence on a material issue, the Court is to construe the conflicting evidence in the light most favorable to the non-moving party. See Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006). Factual assertions in the moving party's affidavits or declarations may be accepted as true unless the opposing party submits his own affidavits, declarations, or documentary evidence to the contrary. Neal v. Kelly, 963 F.2d 453, 456–57 (D.C. Cir. 1992).

5

"FOIA cases typically and appropriately are decided on motions for summary judgment." Defs. of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); see Bigwood v. U.S. Agency for Int'l Dev., 484 F. Supp. 2d 68, 73 (D.D.C. 2007). In FOIA cases, the agency bears the ultimate burden of proof to demonstrate the adequacy of its search and that it properly withheld any records. See Defs. of Wildlife, 623 F. Supp. 2d at 88, 91. The Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981). Such affidavits or declarations are "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., Inc. v. Secs. Exchange Comm'n, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. Cent. Intelligence Agency, 692 F.2d 770, 771 (D.C. Cir. 1981)).

### III. Analysis

As set out above, Plaintiff requests the production of all "non-agency" records, the production of responsive pages without Exemption 6 redactions, and, alternatively, *in camera* review. See Pl. Opp. at 5. The Court will tackle each contention in turn.

#### A. Agency Records

Shaw first disputes DOJ's classification of over 300 pages as "non-agency" records. "[I]n order for a document to be subject to FOIA disclosure, it must be an 'agency record.'" Media Research Ctr. v. DOJ, 818 F. Supp. 2d 131, 139 (D.D.C. 2011) (quoting 5 U.S.C.

§ 552(a)(4)(B)).  "[T]o determine whether a document is an agency record . . . [, the Court] must 'focus[ ] on a variety of factors surrounding the creation, possession, control, and use of the document.'"  Judicial Watch, Inc. v. U.S. Secret Serv. (Judicial Watch II), 726 F.3d 208, 217 (D.C. Cir. 2013) (quoting Consumer Fed'n of Am. v. Dep't of Agric., 455 F.3d 283, 287 (D.C. Cir. 2006)) (second alteration in original).  As it is undisputed that a DOJ employee (Breuer) created the emails and that DOJ currently possesses and controls them, see ECF No. 30-2 (Def. Opp. & Cross-MSJ) at 6, the Court need focus only on the last factor — namely, their use.

In cases such as this one, where a record "is created by an agency employee [and is physically located within an agency], consideration of whether and to what extent that employee used the document to conduct agency business is highly relevant for determining whether that document is an 'agency record.'"  Bureau of Nat'l Affairs, Inc. v. DOJ, 742 F.2d 1484, 1492 (D.C. Cir. 1984).  A record's use is determined by considering "'the purpose for which the document was created, the actual use of the document, and the extent to which the creator of the document and other employees acting within the scope of their employment relied upon the document to carry out the business of the agency.'"  Media Research Ctr., 818 F. Supp. 2d at 140 (quoting Gallant v. Nat'l Labor Relations Bd., 26 F.3d 168, 172 (D.C. Cir. 1994)).

Christina Butler, DOJ's Deputy Chief of the Criminal Division's FOIA/Privacy Act Unit, explains that the 300 pages in question relate to "family members, health, career information, religion, vacations, recreational activities, personal time outside of work, and memorial service information" with attachments of "private photos of family members and friends."  ECF No. 30-3 (Declaration of Christina Butler), ¶ 37.  She further avers that "Breuer did not use the emails to conduct agency business, the emails do not relate to the mission of the Criminal Division, and Criminal Division employees did not rely upon these documents to perform their official duties."

Id. Breuer, in fact, had been a long-time Covington attorney before he joined DOJ, and it is unsurprising that he would remain in close contact with his former colleagues on purely personal matters. With no reason to doubt Butler's assertions, the Court has little trouble concluding that these pages were created and used for the purely personal objective of corresponding with friends and former colleagues in matters entirely unrelated to DOJ activities or Blixseth. See Gallant, 26 F.3d at 172 (official's letters and faxes to individuals to secure her reappointment were not agency records because they were created and used for the "purely personal objective of retaining her job").

Plaintiff attempts to breathe life into her argument by alleging that Breuer sent several emails to his DOJ assistants to organize his personal as well as business appointments. See Pl. Opp. at 8. This may be true, but DOJ has already disclosed such emails. See Def. Reply at 2–3 ("[A]ny of Mr. Breuer's email exchanges that mentioned work related matters, but contained personal information were processed and non-exempt portions were released.") (citations and quotation marks omitted). And even if DOJ had not, sending personal emails to assistants to organize appointments does not render them agency records. See Bureau of Nat'l Affairs, Inc., 742 F.2d at 1496 (appointment calendars were not agency records because purpose of calendars was to "organize both their business and personal activities" for personal "convenience" of officials); Consumer Fed'n of Am., 455 F.3d at 288 (calendars retained for convenience of individual official "in organizing his 'personal and business appointments'" were not agency records even though official's top assistants "occasionally had access to the calendars"); cf. Bureau of Nat'l Affairs, Inc., 742 F.2d at 1495 (personal agendas were agency records because they were distributed to other employees for express purpose of informing his staff of the

official's whereabouts for convenience of staff in conducting official business). The Court thus finds that these pages are indeed non-agency records.

In addition to the merits, Plaintiff takes issue with the sufficiency of Butler's Declaration. She first contends that Butler's assertions are conclusory and fail to rebut the presumption that the pages constitute "agency records." See Pl. Opp. at 8.

Because DOJ alone possesses knowledge of the precise content of the pages withheld, the Declaration must "enable 'the District Court to make a rational decision whether the withheld material must be produced without actually viewing the document themselves, as well as to produce a record that will render the District Court's decision capable of meaningful review on appeal.'" King v. DOJ, 830 F.2d 210, 219 (D.C. Cir. 1987) (quoting Dellems v. Powell, 642 F.2d 1351, 1360 (D.C. Cir. 1980)). "Where the agency's . . . declarations merely 'parrot the language of the statute and are drawn in conclusory terms,' . . . the Court's ability to conduct its own review of the agency's determinations is severely frustrated." Defs. of Wildlife, 623 F. Supp. 2d at 90 (quoting Carter v. U.S. Dep't of Commerce, 830 F.2d 388, 393 (D.C. Cir. 1987)).

In Media Research Center, the plaintiffs sought communications between then–Solicitor General Elena Kagan and the Executive Office of the President. See 818 F. Supp. 2d at 134–35. DOJ withheld as non-agency records around 100 emails between Kagan and staff members of the Executive Office that related to her nomination to the U.S. Supreme Court. Id. at 139. In responding to the plaintiff's motion to compel their disclosure, DOJ submitted a declaration with the following justification for withholding the emails:

> [Thirty-six] pages consisted of emails sent to or received by Ms. Kagan in her individual capacity as a nominee to the United States Supreme Court. . . . These personal emails were communications between Ms. Kagan and the members of the White House staff who were responsible for preparing Ms. Kagan for the confirmation process at the U.S. Senate.

9

Media Research Ctr., No. 10-2013, ECF No. 10-3, ¶ 14(b) (Mar. 15, 2011) (Decl. of Valerie Hall). The court found Hall's justification sufficiently detailed and relied on it in concluding that Kagan's emails were non-agency records. See Media Research Ctr., 818 F. Supp. 2d at 140.

Here, Butler's Declaration explains:

> The emails that were deemed not agency records are private in nature and unrelated to work. The emails contain purely personal information regarding family members, health, career information, religion, vacations, recreational activities, personal time outside of work, and memorial service information. Some of the emails attach private photos of family members and friends. Lanny Breuer did not use the emails to conduct agency business, the emails do not relate to the mission of the Criminal Division, and Criminal Division employees did not rely upon these documents to perform their official duties.

Butler Decl., ¶ 37. Like Hall's, Butler's Declaration details the participating parties and the general content of each email. It therefore provides sufficient detail for the Court to determine the content of the pages.

Shaw next maintains that Butler's Declaration is inadequate because she does not have "personal knowledge regarding whether and to what extent the allegedly personal emails may have been shared with and/or used by agency employees for official purposes." Pl. Opp. at 9.

Although a declaration "must be made on personal knowledge" of the records at issue, see Fed. R. Civ. P. 56(c)(4), "[t]he declaration of an agency official who is knowledgeable about the way in which information is processed and is familiar with the documents at issue satisfies the personal knowledge requirement." Carter, Fullerton & Hayes LLC v. FTC, 520 F. Supp. 2d 134, 146 (D.D.C. 2007). Moreover, a "declarant is not required to independently verify the information contained in each responsive record" to have personal knowledge. See Barnard v. DHS, 531 F. Supp. 2d 131, 138 (D.D.C. 2008).

In Barnard, for example, the Department of Homeland Security submitted a declaration by Marshall H. Fields, Chief of the FOIA/PA Section at ICE, explaining the contents of records relating to an investigation into travel restrictions. Id. at 137, 139. Fields's official responsibilities included "the general management, oversight, and supervision of the FOIA/PA Section," and in response to Barnard's request, he "reviewed all documents . . . 'line-by-line' to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied." Id. at 139 (quoting Fields Declaration). The plaintiff argued that because Fields was not directly involved in the investigation, he did not have the requisite personal knowledge to demonstrate the documents' classification under FOIA exemptions. Id. at 138–40. The Court rejected that argument, however, explaining that, as Chief of the FOIA/PA Section, Fields was "familiar with the processes used to search for the records at issue, and because he [had] reviewed the records himself, he [was] competent to testify as to the information contained in those records." Id. at 139.

Likewise, because Butler, as Deputy Chief of the FOIA/PA Unit at DOJ Criminal Division, "supervis[es] the handling of the FOIA and PA requests processed by the Criminal Division, FOIA/PA Unit," Butler Decl., ¶ 1, and she "reviewed line-by-line" all pages of records at issue, id., ¶ 69, she is no less knowledgeable about the records than Fields was. See Barnard, 531 F. Supp. 2d at 138–39 (finding sufficient Fields Declaration as to personal knowledge of FOIA documents). As this Court believes Barnard was correctly decided, it concludes that Bulter's Declaration was similarly sufficient in describing the content of the pages at issue.

The Court finds, consequently, that these pages were properly withheld as non-agency records.

B. Exemption 6

Moving to Plaintiff's second argument, the Court next examines whether DOJ was warranted in redacting and withholding information under Exemption 6, which protects "personnel and medical files and similar files[,] the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). In such instances, the government must also show that the privacy interest outweighs the public interest in disclosure. See Armstrong v. Exec. Office of the President, 97 F.3d 575, 582 (D.C. Cir. 1996). The primary purpose of this exemption is "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." Prison Legal News v. Samuels, 787 F.3d 1142, 1147 (D.C. Cir. 2015) (quoting Judicial Watch of Florida, Inc. v. DOJ (Judicial Watch I), 365 F.3d 1108, 1124 (D.C. Cir. 2004)). Shaw does not dispute that the records requested are contained within personnel or similar files. The remaining questions, therefore, are whether the information withheld is sufficiently private and whether that privacy interest outweighs the public interest in disclosure.

Generally, agencies have used this exemption to withhold personal information such as place of birth, date of birth, date of marriage, employment history, addresses, information in a discipline letter, family history, and the like. See, e.g., U.S. Dep't of State v. Wash. Post Co., 456 U.S. 595, 600 (1982). Defendant argues that it properly withheld exactly this type of information here, such as "personal email addresses, home addresses, personal cell phone numbers . . . [,] information regarding . . . their family members[,] . . . recreational activities, personal time outside of work, personal travel, personal finances, religious affiliation, and personal job related information." Def. Opp. at 12. Defendant redacted words, sentences, and paragraphs of 435 pages of emails under Exemption 6. Plaintiff attached some of these emails to her pleadings, and the Court finds that the context makes clear that the redactions relate to

private information — *e.g.*, email addresses, names, and event details. See Pl. Opp., Exhs. 1 & 2. Defendant also withheld in full 46 pages under Exemption 6, the vast majority of which were email attachments of resumes, invitations, and photographs. See Def. Opp. Exh. P (Vaughn Index). This Court finds that these withholdings and redactions protect a reasonably substantial privacy interest under Exemption 6. But is there a public interest that overcomes this privacy interest?

The only valid public interest in the FOIA context is one that serves the Act's core purpose of shedding light on an agency's performance of its statutory duties. See DOJ v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 773 (1989). The requester has the burden of establishing that public interest. See Carter, 830 F.2d at 390 n.8, 391 n.13. If a requester can demonstrate that disclosure would "check against corruption and . . . hold the governors accountable to the governed," NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1998), she can generally satisfy this requirement. But the balancing test does not even come into play when the requester demonstrates only a "bare suspicion" of wrongdoing and produces no evidence to "warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 175 (2004) (considering balancing test as applied to Exemption 7(C)). Allegations of government misconduct are "easy to allege and hard to disprove." Crawford-El v. Britton, 523 U.S. 574, 585 (1989). Consider Blackwell v. FBI, 646 F.3d 37 (D.C. Cir. 2011), where the court found that the plaintiff failed to meet the Favish standard because the only support he had offered for his allegations of misconduct was his own affidavit that listed allegedly suspicious circumstances but lacked any substantive evidentiary support. Id. at 41.

Such is the case here. While Plaintiff argues that her request "involves potential corruption at the highest levels of [DOJ]," Pl. MSJ at 1, she offers little beyond conjecture. Like in <u>Blackwell</u>, Blixseth's allegation is "bare suspicion," not evidence that would warrant a belief by a reasonable person that government impropriety had occurred. See <u>Favish</u>, 541 U.S. at 174–75. Blixseth hinges his corruption claim on an alleged meeting in which one of the attendees was connected to a judge, who, after the meeting, granted summary judgement against him. See Pl. Reply at 4, 5. Blixseth alleges that Covington lawyers who formerly worked at DOJ were also at this meeting. <u>Id.</u> at 5. But he admits that he does not know if this meeting actually happened, and his connection of Breuer or Fagell to this alleged gathering is simply a guess. <u>Id.</u> at 4, 5. Blixseth implies that Breuer or Fagell used their former government criminal ties to influence the judge against him in that civil proceeding. From this unfounded theory, Plaintiff believes that Breuer's DOJ emails from 2009–2013 to "cov.com" — years <u>before</u> the unconfirmed meeting with unknown attendees — include information of such significant public interest that the privacy interest in the withheld and redacted information under Exemption 6 is overcome. This Court is not remotely convinced.

Because Plaintiff fails to demonstrate a public interest to outweigh any privacy interest, this Court finds that Defendant's invocation of Exemption 6 is warranted.

C. *In Camera* Review

Plaintiff also contends that if this Court believes that the records withheld should not be produced, it should at least review such pages *in camera* prior to making a final determination. See Pl. Opp. at 14. The decision to conduct an *in camera* examination is discretionary and typically occurs only in exceptional cases. See <u>Robbins Tire</u>, 437 U.S. at 224. "Summary judgment may not be appropriate without in camera review when agency affidavits in support of

a claim of exemption are insufficiently detailed . . . ." Armstrong, 97 F.3d at 578.  District courts have broad discretion to decide if this review "is necessary to determine whether the government has met its burden."  Loving v. U.S. Dep't of Def., 550 F.3d 32, 41 (D.C. Cir. 2008).

This Court at times has agreed that *in camera* review is appropriate and has performed this task in numerous cases.  See, e.g., Cable News Network, Inc. v. FBI, 384 F. Supp. 3d 19, 27 (D.D.C. 2019); Am. Ctr. for Law & Justice v. U.S. Dep't of State, 354 F. Supp. 3d 1, 5 (D.D.C. 2018).  Here, DOJ has met its burden by submitting a highly detailed Vaughn Index and declaration.  See Butler Decl; Vaughn Index.  "When a district court finds that law enforcement agency's affidavits sufficiently describe the documents and set forth proper reasons for invoking an exemption, *in camera* inspection of those documents is unnecessary."  Juarez v. DOJ, 518 F.3d 54, 60 (D.C. Cir. 2008). Further, *in camera* review is more appropriate when a few pages are in question; here, however, Plaintiff asks for hundreds of pages to be reviewed.  This is much more demanding on the Court.

Because DOJ has sufficiently detailed support for why it withheld and redacted pages, this Court will not grant *in camera* review.

**IV. Conclusion**

For the foregoing reasons, the Court will deny Plaintiff's Motion for Summary Judgment and grant Defendant's Motion for Summary Judgment.  A contemporaneous Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  November 19, 2019